**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTHONY VINCENTE GUGLIOTTA,<br><br>               Petitioner,<br><br>    v.<br><br>SILVIA GARCIA (Warden),<br><br>             Respondent. | No. CV 03-9615-SJO(CW)<br><br>REPORT AND RECOMMENDATION OF<br>UNITED STATES MAGISTRATE JUDGE |

This Report and Recommendation is submitted to the Honorable S. James Otero, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.  For the reasons stated below, the petition for habeas corpus relief should be denied and this action dismissed with prejudice.

## I.   PROCEDURAL HISTORY

Petitioner, a prisoner in the custody of the California Department of Corrections, challenges a conviction in California Superior Court, Los Angeles County (Case No. BA133225).  On January 14, 1998, following a bench trial, Petitioner was found guilty of one

1

count of kidnaping for sexual purposes (count 1), one count of second degree robbery (count 2), four counts of forcible rape (counts 3, 5, 12, and 14), three counts of forcible rape while acting in concert (counts 4, 11, and 13), two counts of attempted forcible rape while acting in concert (counts 6 and 8), and two counts of attempted forcible rape (counts 7 and 9).  [2 Clerk's Transcript ("CT") 450-51; 8 Reporter's Transcript ("RT") 1608-09.]  The trial court found Petitioner not guilty of one count of forcible rape (count 10).  [2 CT 450; 8 RT 1609.]  The trial court found true the following special allegations: as to counts 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, and 14, that Petitioner kidnaped the victim for the purpose of committing the charged offenses; as to counts 3, 4, 5, 11, 12, 13, and 14, that Petitioner kidnaped the victim and the movement of the victim during the kidnaping substantially increased the risk of harm to the victim; as to counts 3, 4, 5, 11, 12, 13, and 14, that a principal used a deadly weapon; and as to count 3, that Petitioner personally used a dangerous or deadly weapon.[1]  [2 CT 451, 530-31; 8 RT 1610, 1618-19.]  Petitioner was sentenced to state prison for forty-five years and four months to life.[2]  [2 CT 545-51; 8 RT 1633-37.]

Petitioner appealed.  [Return, Exhibit ("Exh.") A.]  In an

---

[1]  Petitioner was tried jointly with co-defendant Michael Hearns. The trial court found Hearns guilty of additional offenses and found true various other special allegations.  [2 CT 447-49; 8 RT 1604-08.]

[2]  This sentence included three years on count 2; a stayed term of eight years on count 1; a consecutive term of twenty-five years to life on count 3; a consecutive term of five years on count 4; a stayed term of six years on count 5; a consecutive term of fourteen months on count 6; a stayed term of three years on count 7; a consecutive term of fourteen months on count 8; a stayed term of three years on count 9; a consecutive term of five years on count 11; a stayed term of six years on count 12; a consecutive term of five years on count 13; and a stayed term of six years on count 14.  [CT 545-51; 8 RT 1633-37.]

unpublished decision filed on December 27, 1999, the California Court of Appeal reversed Petitioner's convictions for forcible rape while acting in concert (counts 4, 11, and 13) and attempted forcible rape while acting in concert (counts 6 and 8), affirmed the judgment in all other respects, and remanded the case so that the sentences imposed and stayed on counts 5, 7, 9, 12, and 14 might be ordered into full force and effect. [Return, Exh. B, No. B124059.] Petitioner filed a petition for review in the California Supreme Court, which summarily denied review on March 29, 2000. [Return, Exh. C, No. S085667.]

On remand before the trial court, Petitioner filed a motion for a new trial, which was denied on jurisdictional grounds. [Supplemental ("Sup.") CT 15-30, 36-47, 3 Appeal After Remittitur ("AAR") RT 28.] Petitioner was resentenced to thirty-nine years to life. [AAR CT 16-20; 3 AAR RT 32-35.][3] Petitioner appealed this sentence and also filed a petition for writ of habeas corpus in the California Court of Appeal. [Return, Exhs. D, H.] In an unpublished opinion filed on July 17, 2002, and modified on August 7, 2002, the California Court of Appeal remanded the matter with directions to award appropriate custody credits and to enter a new abstract of judgment, and affirmed the judgment in all other respects. [Return, Exh. G, No. B152302.] In an unpublished order also filed on July 17, 2002, the appellate court summarily denied the habeas petition. [Return, Exh. H, No. B159330.]

---

[3] Petitioner's new sentence included three years on count 2; a stayed term of eight years on count 1; a consecutive term of twenty-five years to life on count 3; a consecutive term of three years on count 5; a consecutive term of one year on count 7; a consecutive term of one year on count 9; a consecutive term of three years on count 12; and a consecutive term of three years on count 14. [AAR CT 16-20; 3 AAR RT 32-35.]

Petitioner filed a petition for review and a petition for writ of habeas corpus in the California Supreme Court, which summarily denied both petitions on October 2, 2002 and November 13, 2002, respectively. [Return, Exhs. I, No. S109375, J, No. S109406.]

On December 31, 2003, Petitioner, through counsel, filed the present Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition"), with a Memorandum of Points and Authorities in Support of Petition ("MPA Petition").  On March 10, 2004, Respondent filed a Return.  On October 18, 2004, Petitioner filed a Traverse.

## II.  **FACTUAL BACKGROUND**

In its December 27, 1999 opinion, the California Court of Appeal summarized the evidence against Petitioner as follows:

> At approximately 9 p.m. on June 2, 1996, 19-year-old Maria R. stopped her Chevy at a stop sign while returning to the William Mead Housing Project (also known as the "Dogtown Projects"), where she resided with her parents.  Hearns and [Petitioner], both of whom were Dogtown gang members and both of whom were known to Maria R., approached the vehicle. Hearns reached into the open car window, put a knife to Maria R.'s throat and demanded money.  She initially indicated she had none, but Hearns countered, "'Yes,' you do because you work."  He repeated his demand, warning Maria R. that if she did not comply, he would take her jewelry.  When he thereafter moved the knife down toward her legs, she admitted she did have money, and she handed him $20.
>
> At Hearns's direction, [Petitioner] then got into the back seat of Maria R.'s Chevy.  Once [Petitioner] was seated, Hearns positioned himself in the front passenger

4

seat next to Maria R. and placed the knife against her
throat.  In accordance with Hearns's instructions, Maria R.
drove to an apartment building, where Hearns exited.  As he
did so, he handed [Petitioner] the knife and said, "If she
does anything stupid, you know what to do."  [Petitioner]
held the knife to Maria R.'s back and Hearns went into the
apartment building.  A short time later, Hearns returned
with two "rocks" of crack cocaine.

After re-entering Maria R.'s Chevy, Hearns directed her
to drive to an area near some railroad tracks.  Once they
had parked, Hearns mixed pieces of the crack cocaine with
the tobacco from some cigarettes.  When Maria R. repeatedly
asked that she be permitted to go home, Hearns informed her
that he was kidnapping her.  Hearns and [Petitioner] smoked
the drug-laced cigarettes and Maria R. joined them at
Hearns's insistence and threats to "get physical" if she
"argue[d] with him."  Having never before ingested drugs or
smoked tobacco, she began to feel dizzy.  At that juncture,
Hearns told [Petitioner] to leave the car.  He then ordered
Maria R. to remove her pants and get on top of him, warning
her he would "hurt [her]" if she did not "listen to what he
said and agree with him."  Once she had complied with his
commands, he inserted his penis into her vagina.  Following
the rape, Hearns called [Petitioner] back to the car.

Hearns thereupon took the wheel of the Chevy and drove
to a location on Michigan Street, "looking for some guys"
from whom to purchase additional cocaine.  He asked Maria R.
for more money and upon learning that she had none, advised

5

her he was "going to sell [her] for drugs."  Hearns
explained that he planned to say Maria R. "was one of his
home girls" who "had just gotten jumped into Dogtown."
Hearns cautioned her that if she said anything to the
contrary, he would leave her behind, in territory claimed by
the Breed gang.  Hearns then exited Maria R.'s Chevy to
speak to three apparent gang members, leaving [Petitioner]
in the car with Maria R.

     Upon Hearns's return, he ordered Maria R. to get out of
the car and [Petitioner] to remain inside.  Hearns affirmed
that he had indeed "sold [Maria R.] to those guys for
drugs," identifying her as a "home girl" who was "doing this
because [she] wanted some drugs."  Hearns reminded Maria R.
"not to say anything because then he would leave [her]
there."  Maria R. accompanied Hearns and the three men over
the fence of an abandoned house.  Behind the house, the
first of the men, a bald individual who identified himself
by his gang moniker ("Spooky"), directed Maria R. to remove
her pants and panties and lie on the ground.  When she
refused to lie down, he had intercourse with her as she
stood against the wall.  After "Spooky" left, the second
man, a long-haired individual who said he was not a member
of the gang, joined her behind the abandoned house.  He
asked, "'Are you from the gang[?] . . . You just got jumped
in, huh?'"  Maria R. said nothing.  The long-haired man then
attempted to insert his penis into her vagina, but he could
not get an erection.  The third man ("Casper") too was
unable to achieve an erection.  When he suggested that he

6

"'do [Maria R.] through the back,'" she refused.  Because of her fear and Hearns's close proximity, Maria R. did not disclose to any of the men that she "was there against [her] will."

Maria R. and Hearns thereafter returned to her Chevy, where [Petitioner] remained waiting in the back seat, and Hearns drove back to the railroad tracks.  There, he produced three "rocks" and added them to some cigarettes as he had done earlier.  He again insisted that Maria R. join him and [Petitioner] in smoking the cocaine-laced cigarettes.  She felt "[r]eal dizzy" and ill, but Hearns refused to allow her to go home.  He said she "was going to s[t]ay with him until whatever time that he wanted to" and then he raped her a second time before driving to another location and stopping in front of an apartment building on Breed Street.

After speaking to someone on the street, Hearns went into the apartment building, leaving [Petitioner] inside the Chevy with Maria R.  Hearns soon returned to the vehicle and escorted Maria R. onto the premises of the apartment building, advising her that he had "sold her" to a man by the name of Candelario for two "rocks."  Candelario took Maria R. into a parking lot behind the building and inquired "what was [she] doing there," and she replied, "'It is not like if I want to be here.'"  Candelario asked, "'You like doing this?'"  Maria R. replied, "'No. . . . I am not like that,'" but "was scared to tell him . . . what was going on . . . ."  Candelario then had intercourse with her.

7

Afterwards, he said "he wanted to get to know [her] more"
and gave her his phone number.

Hearns, [Petitioner] and Maria R. returned to the
railroad . . . tracks for a third time, where Hearns
prepared a new supply of cocaine-laced cigarettes.  Hearns
once again forced Maria R. to smoke them and ignored her
renewed entreaties that she be allowed to go home.  Instead,
Hearns returned to Candelario's apartment, where he "made"
Maria R., who was by that time extremely unsteady on her
feet, have intercourse with Candelario for a second time.
As was true on the first occasion, Maria R. did not tell
Candelario she was there involuntarily.  Candelario again
gave Maria R. his phone number and asked her to call him.

Hearns thereafter made a fourth and final trip to the
railroad tracks.  He produced two "rocks" and added them to
more cigarettes, which he, [Petitioner] and Maria R. smoked.
Before leaving the area, Hearns threatened to kill Maria R.,
saying she was a "snitch."  When she insisted she would not
say anything about the night's events, Hearns responded,
"'If you do, we know where your family lives.'"  Hearns then
drove to the Maravilla Housing Project in East Los Angeles,
where he was staying with his girlfriend.  After he exited
the Chevy, Maria R. returned to the William Mead Housing
Project.  [Petitioner] remained in the car with her until
she stopped to make a turn, at which time he existed without
a word.  Fearful of Hearns's threats toward her family,
Maria R. did not report her ordeal, which had spanned some
six to seven hours, to the police until June 4, 1996.

1   [Petitioner] presented no defense.  Hearns, however,
2   strongly disputed Maria R.['s] version of events.  He
3   testified that she had given him and [Petitioner] a ride to
4   East Los Angeles to buy crack cocaine.  After he had
5   purchased the drugs, he, Maria R. and [Petitioner] went to
6   the railroad tracks.  There, he "hooked up something called
7   cocoa puff" with the cocaine and some cigarettes.  Although
8   Maria R. had initially "wanted to smoke weed," she
9   voluntarily joined Hearns and [Petitioner] in smoking the
10  "cocoa puff."  As she and Hearns talked, Maria R. revealed
11  her desire to be affiliated with a gang and her preference
12  for the Dogtown gang.  Hearns explained that she could
13  either "get jumped in by homegirls" or she could "get fucked
14  in."  She selected the latter method and chose Hearns to "do
15  the honors."  He acceded to her wishes and they had
16  consensual intercourse once "to get her in [the gang]."
17  Afterwards, they left "[t]o go score again."  Although
18  Hearns did not have any more money, Maria R. said "she was
19  down for the neighborhood" and "want[ed] to prove herself,"
20  so she "took [them] to a bunch of guys."  She disappeared
21  briefly with these individuals before returning to the car
22  with some crack cocaine.  She then drove back to the
23  railroad tracks where she, Hearns and [Petitioner] once
24  again ingested drugs using a cigarette.  Thereafter, they
25  traveled to another location, where Maria R. talked to a
26  group of people, disappeared for 10 to 15 minutes and
27  returned with more crack cocaine, which the three of them
28  smoked at the railroad tracks.  Hearns then drove Maria R.'s

9

Chevy to the Maravilla Housing Project.  As he got out of
the car, she drove off.  The next day, Hearns went to Maria
R.'s residence and knocked on her bedroom window.  When she
opened the window, he said, "'Come out, kick it with the
guys.'"  She declined, indicating she had to remain at home
with her family.

[Return, Exh. B at 63-67 (footnotes omitted).]

### III.  PETITIONER'S CLAIMS

Petitioner states the following claims for federal habeas relief:

1.  Petitioner received ineffective assistance of counsel when
his trial attorney failed to investigate and present a mental defense
that Petitioner was intoxicated during the crimes and had suffered
brain damage as an infant and, therefore, was unable to form the
requisite specific intent.  [Petition at 5.]

2.  The prosecutor committed misconduct by eliciting testimony
as to whether Petitioner had raped the victim, despite a stipulation
between the parties to the fact that Petitioner did not have sexual
contact with the victim.  [Petition at 5.]

3.  Petitioner received ineffective assistance of counsel when
his trial attorney failed to object to the prosecutor's elicitation of
testimony that Petitioner had committed rape, which violated a
stipulation and constituted inadmissible hearsay evidence.  [Petition
at 6.]

4.  Petitioner's sentence of thirty-nine years to life
constituted cruel and unusual punishment in violation of the Eighth
Amendment.  [Petition at 6.]

5.  Petitioner received ineffective assistance of counsel when
his trial counsel failed to present "any argument" when some "would at

the very least have mitigated his culpability." [Petition at 6a.]

## IV.  **STANDARD OF REVIEW**

A federal court may review a habeas petition by a person in custody under a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal habeas relief is not available for state law errors.  <u>Swarthout v. Cook</u>, ___ U.S. ___, 131 S. Ct. 859, 861, 178 L. Ed. 2d 732 (2011)(<u>per curiam</u>)(<u>citing</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  <u>Harrington v. Richter</u>, ___ U.S. ___, 131 S. Ct. 770, 784-85, 178 L. Ed. 2d 624 (2011).

"Clearly established federal law" means federal law clearly defined by the holdings of the Supreme Court at the time of the state court decision.  <u>Cullen v. Pinholster</u>, ___ U.S. ___, 131 S. Ct. 1388, 1399, 178 L. Ed. 2d 624 (2011); <u>Harrington v. Richter</u>, 131 S. Ct. at

785; <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L.
Ed. 2d 389 (2000); <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir.
2011).  Although only Supreme Court law is binding, "circuit court
precedent may be persuasive in determining what law is clearly
established and whether a state court applied that law unreasonably."
<u>Stanley</u>, 633 F.3d at 859 (<u>quoting</u> <u>Maxwell v. Roe</u>, 606 F.3d 561, 567
(9th Cir. 2010)).

   "To determine whether a particular decision is 'contrary to'
then-established law, a federal court must consider whether the
decision 'applies a rule that contradicts [such] law' and how the
decision 'confronts [the] set of facts' that were before the state
court."  <u>Cullen v. Pinholster</u>, 131 S. Ct. at 1399 (<u>citing</u> <u>Williams</u>,
529 U.S. at 405-06).  "If the state-court decision 'identifies the
correct governing legal principle' in existence at the time, a federal
court must assess whether the decision 'unreasonably applies that
principle to the facts of the prisoner's case.'"  <u>Cullen v.
Pinholster</u>, 131 S. Ct. at 1399 (<u>citing</u> <u>Williams</u>, 529 U.S. at 413).
"'[A]n <u>unreasonable</u> application of federal law is different from an
<u>incorrect</u> application of federal law."  <u>Harrington v. Richter</u>, 131 S.
Ct. at 785 (<u>quoting</u> <u>Williams</u>, 529 U.S. at 410).  "A state court's
determination that a claim lacks merit precludes federal habeas relief
so long as 'fairminded jurists could disagree' on the correctness of
the state court's decision."  <u>Harrington v. Richter</u>, 131 S. Ct. at 785
(<u>citing</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S. Ct. 2140,
158 L. Ed. 2d 938 (2004)).

   A federal habeas court must defer, under § 2254(d), to a state
court decision on the merits, "even where there has been a summary
denial."  <u>Cullen v. Pinholster</u>, 131 S. Ct. at 1402 (<u>citing</u> <u>Harrington</u>

1  v. Richter, 131 S. Ct. at 786).   In the face of a summary denial by a

2  state court, a petitioner "can satisfy the 'unreasonable application'

3  prong of § 2254(d)(1) only by showing that 'there was no reasonable

4  basis'" for the state court's decision.   Cullen v. Pinholster, 131 S.

5  Ct. at 1402 (citing Harrington v. Richter, 131 S. Ct. at 784).   A

6  federal "habeas court must determine what arguments or theories

7  supported, or . . . could have supported, the state court's decision;

8  and then it must ask whether it is possible fairminded jurists could

9  disagree that those arguments or theories are inconsistent with the

10  holding in a prior decision of [the Supreme] Court."   Harrington v.

11  Richter, 131 S. Ct. at 786.

12      In sum, the AEDPA dictates that "[a]s a condition for obtaining

13  habeas corpus from a federal court, a state prisoner must show that

14  the state court's ruling on the claim being presented in federal court

15  was so lacking in justification that there was an error well

16  understood and comprehended in existing law beyond any possibility for

17  fairminded disagreement."   Id. at 786-87.

18                          **V.   DISCUSSION**

19      Two of the claims which Petitioner asserts here - claim four,

20  challenging his sentence as a violation of the Eighth Amendment's

21  proscription against cruel and unusual punishment; and claim five,

22  challenging his trial counsel's failure to present any argument - were

23  raised on direct appeal and were rejected by the California Court of

24  Appeal in written opinions filed on July 17, 2002 (and modified on

25  August 7, 2002) and December 27, 1999, respectively.  [Return, Exhs.

26  A, B at 71-73, D, G at 198-202.]   Accordingly, in the first instance,

27  this court should review the opinion of the court of appeal for

28  purposes of AEDPA review of those claims.   See Shackleford v. Hubbard,

                                   13

234 F.3d 1072, 1079 n. 2 (9th Cir. 2000)(citing Ylst v. Nunnemaker, 501 U.S. 797, 803-804, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991)). The remainder of Petitioner's other claims were raised before the state courts in habeas corpus petitions which were summarily denied without comment or citation of authority. [Return, Exhs. H, J.] In reviewing these remaining claims, this court "must determine what arguments or theories supported, or . . . could have supported, the state court's decision" and must then determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington v. Richter, 131 S. Ct. at 786.

**A.   PROSECUTORIAL MISCONDUCT**

Petitioner contends that the prosecutor committed misconduct by eliciting testimony as to whether Petitioner had raped the victim, despite a stipulation between the parties to the fact that Petitioner did not have sexual contact with the victim.[4]  [Petition at 5.]

**1.   Background**

At the preliminary hearing, defense counsel sought to present an affirmative defense by calling the victim, Maria R., to testify that she did not have sexual contact with Petitioner.[5]  [1 CT 106-07.]  The prosecutor indicated that she would not be alleging that Petitioner

---

[4]  This claim refers to count 3 (alleging that Petitioner and Hearns raped Maria R. during the first visit to the railroad tracks). [2 CT 304, 7 RT 1289.]  Petitioner and Hearns were acquitted on count 10 (alleging that Petitioner and Hearns raped Maria R. again during the second visit to the railroad tracks). [2 CT 450; 7 RT 1291, 8 RT 1609.]  All other rape charges refer to the drug-for-sex transactions.

[5]  Jon Takasugi represented Petitioner at the preliminary hearing but was replaced by Floyd Silliman before trial. [2 CT 324.] Silliman died while Petitioner's first appeal was pending or shortly thereafter.  Petitioner's ineffective assistance of counsel claims refer to Silliman.

14

personally committed the charged sex crimes but that he was liable for
the crimes based on an aider and abettor theory. [1 CT 107, 111-12,
120.] The parties then stipulated that, "for the purposes of this
entire proceeding, not only the preliminary hearing but the trial as
well, that [Petitioner] did not have sexual intercourse or sexual
contact with [the] victim, [Maria R.,] at least for purposes of the
People's theory of liability against [Petitioner] in this case." [1
CT 112-13.]

However, defense counsel continued to argue that he should be
able to call Maria R. to testify because "while the People's theory at
this point might be one of aiding and abetting, that . . . theory can
change before we get to trial." [1 CT 120.] The court ruled that
Maria R. was not required to testify at the preliminary hearing
because "there [wa]s [no] reason to have an affirmative defense to a
charge which d[id] not exist." [1 CT 122-23.]

Despite the stipulation, at trial, the prosecutor asked Maria R.
questions regarding whether she was raped by Petitioner after having
been raped by Hearns near the railroad tracks (count 3):

> [Prosecutor:] Do you know whether or not [Petitioner]
> raped you during that period of time?
>
> [Maria R.:] No, I don't know.
>
> [Prosecutor:] I am sorry?
>
> [Maria R.:] I don't know.
>
> [Prosecutor:] So he might have raped you –
>
> . . . .
>
> [[Maria R.:] I don't know.
>
> [Prosecutor:] Do you believe at this point in time that
> . . . [Petitioner] raped you during that same period?

1    [Maria R.:] I don't know.

2    [Prosecutor:] Do you remember writing out a statement

3 regarding the incidents and everything that happened?

4    [Maria R.:] Yes.

5    [Prosecutor:] And giving that to Detective Garcia?

6    [Maria R.:] Yes.

7    [Prosecutor:] Do you remember telling Detective Garcia

8 about having nightmares regarding what had happened to you

9 in this whole incident?

10    [Maria R.:] Yes.

11    [Prosecutor:] Regarding those nightmares, did you tell

12 him, Detective Garcia, anything about [Petitioner]?

13    [Maria R.:] Yes.

14    . . . .

15    [Prosecutor:] Do you remember telling Detective Garcia

16 that, as to this period of time, the first incident at the

17 railroad tracks, anything about whether [Petitioner] raped

18 you or not?

19    [Maria R.:] Yes.

20    . . . .

21    [Prosecutor:] Do you remember telling Detective Garcia

22 that because of the nightmares that you were having it was

23 your belief that [Petitioner] never raped you?

24    [Maria R.:] Yes.

25    [Prosecutor:] Do you remember initially when making the

26 report in June of 1996 telling police officers that you

27 believe [Petitioner] had raped you?

28    [Maria R.:] Yes.

16

1          . . . .

2          [Prosecutor:] What was it that caused you to believe

3     that [Petitioner] had not raped you?

4          [Maria R.:] I started having nightmares, and I couldn't

5     remember what happened during that period of time.  It was

6     just blurry.  It was just from [Hearns] calling

7     [Petitioner], and then from there being on Soto [Street]

8     again.

9          [Prosecutor:] Is it your belief that you cannot

10    remember whether or not [Petitioner] raped you when you were

11    parked outside the railroad tracks . . . ?

12         [Maria R.:] Yes.

13         [Prosecutor:] You don't specifically recall him raping

14    you at all; is that correct?

15         [Maria R.:] That's correct.

16    [1 RT 338-44.]

17        The prosecutor also elicited testimony from Patricia Healy, a

18    registered nurse, who testified that Maria R. reported that she had

19    been raped by Petitioner (and Hearns) in the car.  [3 RT 708, 715,

20    720-21.]

21        **2.   <u>Analysis</u>**

22        On federal habeas review, a court's finding of misconduct by a

23    prosecutor does not automatically invalidate a conviction.  <u>Furman v.</u>

24    <u>Wood</u>, 190 F.3d 1002, 1006 (9th Cir. 1999).  Rather, prosecutorial

25    misconduct rises to the level of a constitutional violation only where

26    the conduct "'so infected the trial with unfairness as to make the

27    resulting conviction a denial of due process.'"  <u>Darden v. Wainwright</u>,

28    477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)(<u>quoting</u>

                                    17

1  <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L.

2  Ed. 2d 431 (1974)); <u>see also</u> <u>Comer v. Schriro</u>, 463 F.3d 934, 960 (9th

3  Cir. 2006); <u>Hovey v. Ayers</u>, 458 F.3d 892, 923 (9th Cir. 2006); <u>Drayden</u>

4  <u>v. White</u>, 232 F.3d 704, 713 (9th Cir. 2000); <u>Sassounian v. Roe</u>, 230

5  F.3d 1097, 1106 (9th Cir. 2000); <u>Thompson v. Borg</u>, 74 F.3d 1571, 1576

6  (9th Cir. 1996); <u>Duckett v. Godinez</u>, 67 F.3d 734, 743 (9th Cir. 1995).

7  Thus, the court considers first whether the prosecutor's conduct was

8  improper, and if so, whether "it is more probable than not that the

9  prosecutor's conduct materially affected the fairness of the trial."

10  <u>United States v. McKoy</u>, 771 F.2d 1207, 1212 (9th Cir. 1985)(citation

11  omitted).  "Th[is] standard allows a federal court to grant relief

12  when the state-court trial was fundamentally unfair but avoids

13  interfering in state-court proceedings when errors fall short of

14  constitutional magnitude."  <u>Drayden</u>, 232 F.3d at 713.

15      Here, although the prosecutor's questions were arguably improper,

16  Petitioner has not demonstrated that the prosecutor's tactics created

17  a material effect on the fairness of the trial.  First, abundant

18  evidence was presented that Petitioner aided and abetted Hearns in

19  raping Maria R.[6]  Petitioner's volitional acts before and after Hearns

20  raped Maria R. near the railroad tracks (count 3) - <u>i.e.</u>, following

21

22      [6]  Under California law, a person who aids and abets the
   commission of a crime is a "principal" in the crime and shares the
23  guilt of the actual perpetrator.  <u>People v. Prettyman</u>, 14 Cal. 4th
   248, 259, 926 P.2d 1013, 58 Cal. Rptr. 2d 827 (1996).  An aider and
24  abettor is a person who, acting with (1) knowledge of the unlawful
   purpose of the perpetrator; and (2) the intent or purpose of
25  committing, encouraging or facilitating the commission of the offense,
   (3) by act or advice aids, promotes, encourages, or instigates the
26  commission of the crime.  <u>Id.</u>; <u>People v. Beeman</u>, 35 Cal. 3d 547, 561,
   674 P.2d 1318, 199 Cal. Rptr. 60 (1984).  "Among the factors which may
27  be considered in making the determination of aiding and abetting are:
   presence at the scene of the crime, companionship, and conduct before
28  and after the offense."  <u>In re Lynette G.</u>, 54 Cal. App. 3d 1087, 1094,
   126 Cal. Rptr. 898 (1976).

1   Hearns by getting into Maria R.'s car after Hearns had robbed her;

2   holding a knife to Maria R.'s back while Hearns went to purchase

3   drugs; remaining in the car with Maria R. while Hearns, whose purpose

4   was fully known to Petitioner, brokered a drug-for-sex transaction;

5   partaking in the consumption of the drugs received from "selling"

6   Maria R., exiting the car so that Hearns could rape Maria R. in

7   private, and entering the car after Hearns had finished raping Maria

8   R. – reasonably corroborated the inference that Petitioner intended to

9   participate in the rape of Maria R., with knowledge of Hearns's

10  wrongful purpose.[7]   Such evidence refuted the notion that Petitioner

11  was merely present at the scene of the rape.

12       Moreover, the prosecutor emphasized during trial that the charge

13  of rape against Petitioner (on count 3) was based "clearly on an

14

15

16  _____

17       [7]   Testimony at trial demonstrated that Hearns and Petitioner,
    both of whom were members of the Downtown gang, together approached
18  Maria R., and that Hearns robbed her at knifepoint.  [1 RT 312-13.]
    Thereafter, Hearns and Petitioner got into Maria R.'s car and drove to
19  an apartment complex.  [1 RT 320.]  While Hearns went into the
    apartment complex to purchase crack cocaine, Petitioner held a knife
20  behind Maria R.'s back to prevent her from escaping.  [1 RT 324-26.]
    Maria R. did not attempt to run away from Petitioner because she was
21  scared.  [1 RT 326.]
         After Hearns returned with the drugs, they drove to an area near
22  railroad tracks.  [1 RT 326.]  There, Petitioner and Hearns smoked
    cigarettes laced with the crack cocaine.  [1 RT 331.]  In response to
23  threats from Hearns, Maria joined them in smoking the drug-laced
    cigarettes.  [1 RT 332.]  Hearns then told Petitioner to leave the
24  car, and Petitioner complied.  [1 RT 333.]  Hearns raped Maria R. in
    the car while Petitioner sat about twelve feet in front of the car.
25  [1 RT 333-37.]  After raping Maria R., Hearns called Petitioner, and
    Petitioner came back into the car.  [1 RT 337, 344-45.]
26       Hearns made several more purchases of drugs by "selling" Maria R.
    [345-49, 355-95.]  When Hearns left the car to broker these
27  transactions, Petitioner remained in the car with Maria R.  [345-49,
    355-95.]  Although Petitioner hardly said anything throughout the
28  night, he never indicated to Maria R. that he would help her or that
    he did not want to be involved in Hearns's criminal acts.

aiding and abetting [theory]."[8]  [2 RT 1298.]  The prosecutor

reiterated, in closing argument, that Petitioner "did not himself

participate or actually rape Maria R." but was "an aider and abett[o]r

to all of the acts."  [8 RT 1578.]  The prosecutor then explained how

Petitioner aided and abetted in the charged crimes.  [8 RT 1578-81.]

Thus, it was clear that Petitioner was being charged for the instant

crimes under an aider and abettor theory.[9]

     Nothing in the record suggests that the trial court relied on the

elicited testimony that Petitioner had personally raped Maria R. in

convicting Petitioner of rape (on count 3).  This is particularly

relevant considering that Petitioner was tried in a jury-waived bench

trial.  This court should assume that the trial judge understood the

legal theory (i.e., aiding and abetting) on which the prosecutor's

case was based, and that the trial judge did not find guilt based on

an improper theory.[10]  See, e.g., Plummer v. Western Int'l Hotels Co.,

Inc., 656 F.2d 502, 505 (9th Cir. 1981)("In a judge-tried trial . . .

'the admission of incompetent evidence over objection will not

ordinarily be a ground of reversal if there was competent evidence

---

     [8]  This statement was made during a hearing on a California Penal
Code section 1118 motion, after the prosecution had rested but before
the defense had presented its case.  [2 RT 1285-1302.]

     [9]  The trial judge did not preside at the preliminary hearing.
It is unclear whether the trial judge was aware of the stipulation
made during the preliminary hearing.

     [10]  Petitioner makes much of the fact that, at sentencing, the
trial court commented that it believed Petitioner had personally raped
Maria R. but that there was insufficient evidence for a conviction on
that theory.  [8 RT 1635.]  Petitioner appears to argue that the trial
court's comment supports his contention that he was convicted of rape
(on count 3) based on an improper theory.  [Traverse at 20.]
Petitioner's contention is unconvincing given the latter part of the
trial court's comment that there was insufficient evidence to
establish principal liability.  [8 RT 1635.]

received sufficient to support the findings.  The judge will be presumed to have disregarded the inadmissible and relied on the competent evidence.'"  (citation omitted)); <u>Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.</u>, 320 F.3d 1213, 1216 (11th Cir. 2003)("[I]t is presumed that the . . . judge will rely only upon properly admitted and relevant evidence."); <u>People v. Miranda</u>, 23 Cal. 4th 340, 351, 1 P.3d 73, 96 Cal. Rptr. 2d 758 (2000)("A judge, unlike a jury, is presumed to be able to avoid the risks of prejudice . . ." (internal quotation marks omitted)).

Petitioner, however, argues that the violation of the stipulation deprived him of an "affirmative defense" that he had not raped Maria R.  [Traverse at 19.]  He alleges that, "had the trial court . . . known that [Maria R.] had been prepared to testify at [the] preliminary hearing . . . , [the court] would have considered this evidence at the guilt and penalty phase of the trial."  [Traverse at 20.]  Petitioner's contention is unpersuasive in light of the fact that Maria R. testified at trial.  Indeed, the direct and cross-examination of Maria R. revealed that she no longer remembered whether Petitioner had personally raped her and that she was concerned about unjustly sending Petitioner to prison.  [1 RT 338-44; 2 RT 450, 587-88, 590.]  Additionally, Maria R. testified that she wrote in her diary the details of the sexual assaults, and that the entries in her diary did not indicate that Petitioner had raped her.  [2 RT 521-28.]

Thus, Petitioner has not shown a due process violation or any prejudice from a breach of the stipulation.  On AEDPA review, it does not appear that the state court's denial of the claim of prosecutorial misconduct was contrary to or an unreasonable application of controlling Supreme Court law.  Therefore, federal habeas corpus

1  relief is not available on this claim.

2      **B.    INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

3      Petitioner contends that his trial counsel rendered ineffective

4  assistance by failing to: (1) investigate and present a mental defense

5  that Petitioner was intoxicated during commission of the crimes and

6  suffered brain damage as an infant and, therefore, was unable to form

7  the required specific intent; (2) object to the prosecutor's eliciting

8  of testimony that Petitioner had committed rape, which violated a

9  stipulation and constituted the admission of inadmissible hearsay

10 evidence; and (3) present a closing argument which "would at the very

11 least have mitigated his culpability." [Petition at 5-6, 6a.]

12      **1.    Legal Standard**

13     The Sixth Amendment guarantees criminal defendants the right to

14 the effective assistance of counsel. Strickland v. Washington, 466

15 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish a

16 claim of ineffective assistance of counsel so as to warrant setting

17 aside a criminal conviction or sentence, a habeas petitioner must show

18 both that counsel's representation fell below an objective standard of

19 reasonableness and that counsel's deficient performance prejudiced the

20 defense. Knowles v. Mirzayance, __ U.S. __, 129 S. Ct. 1411, 1419,

21 173 L. Ed. 2d 251 (2009)(citing Strickland, 466 U.S. at 687). "Without

22 proof of both deficient performance and prejudice to the defense . . .

23 it could not be said that the sentence or conviction 'resulted from a

24 breakdown in the adversary process that rendered the result of the

25 proceeding unreliable,' . . . and the sentence or conviction should

26 stand." Bell v. Cone, 535 U.S. 685, 695, 122 S. Ct. 1843, 152 L. Ed.

27 2d 914 (2002)(quoting Strickland, id.). Consequently, a claim of

28 ineffective assistance must be rejected upon a finding either that

counsel's performance was reasonable or that the alleged error was not prejudicial.  Strickland, 466 U.S. at 697; Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the Strickland test obviates the need to consider the other.").

A reviewing court must examine the reasonableness of counsel's challenged conduct under all the circumstances, including the facts of the particular case as viewed at the time of the conduct.  Strickland, 466 U.S. at 688, 690.  Scrutiny of counsel's performance must be "highly deferential," and a petitioner must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  Id. at 689.  Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 690; see also Harrington, 131 S. Ct. at 788 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (quoting Strickland, 466 U.S. at 690); Bell, 535 U.S. at 702 ("We cautioned in Strickland that a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." (citation omitted)).

To prove prejudice, "[i]t is not enough for the [petitioner] to show that [counsel's] errors had some conceivable effect on the outcome of the proceeding" because "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the

1  result of the proceeding." Strickland, 466 U.S. at 693 (citation

2  omitted).  Rather, a petitioner has the heavier burden of showing a

3  "reasonable probability," sufficient to undermine confidence in the

4  outcome, that, "but for counsel's unprofessional errors, the result of

5  the proceeding would have been different." Id. at 694; see also

6  Harrington, 131 S. Ct. at 792 ("The likelihood of a different result

7  must be substantial, not just conceivable").

8       On AEDPA review of a state court's adjudication of a Strickland

9  claim, "[t]he pivotal question is whether the state court's

10 application of the Strickland standard was unreasonable.  This is

11 different from asking whether defense counsel's performance fell below

12 Strickland's standard." Harrington, 131 S. Ct. at 785.  Given the

13 interplay of the AEDPA and Strickland standards, it is particularly

14 difficult to establish that a state court's decision denying an

15 ineffective assistance of counsel claim was unreasonable:

16      The standards created by Strickland and § 2254(d) are both

17      'highly deferential,' and when the two apply in tandem,

18      review is 'doubly' so. The Strickland standard is a general

19      one, so the range of reasonable applications is substantial.

20      Federal habeas courts must guard against the danger of

21      equating unreasonableness under Strickland with

22      unreasonableness under § 2254(d).  When § 2254(d) applies,

23      the question is not whether counsel's actions were

24      reasonable.  The question is whether there is any reasonable

25      argument that counsel satisfied Strickland's deferential

26      standard.

27 Id. at 788 (citations omitted); see also Premo v. Moore, ___ U.S. __,

28 131 S. Ct. 733, 740, ___ L. Ed. 2d ___ (2011)(same); Cheney v.

24

1   *Washington*, 614 F.3d 987, 994-95 (9th Cir. 2010)(explaining that

2   federal courts must be "doubly deferential" to state court

3   adjudications of *Strickland* claims).

4       **2.   Failure to Investigate and Present a Mental Defense**

5       **a.   Background**

6       Petitioner contends that his trial counsel (Mr. Silliman) failed

7   to investigate and present a mental defense that Petitioner was

8   intoxicated during the commission of the crimes and had suffered brain

9   damage as an infant. [Petition at 5.] Petitioner argues that his

10  trial counsel knew or should have known that further investigation was

11  necessary given that: (1) counsel had received medical reports from

12  his prior counsel (Mr. Takasugi) indicating that Petitioner had

13  suffered from brain damage, and (2) testimony revealed that Petitioner

14  had ingested cocaine prior to the sexual assaults on Maria R. and that

15  he was "in his own world" during the commission of the crimes. [MPA

16  Petition at 15-16.] Petitioner avers that this evidence would have

17  demonstrated that he could not have formed the required intent to

18  commit the crimes with which he was charged.[11]

19      Petitioner has submitted an April 30, 2001 Declaration from Patsy

20  Myers to show that Mr. Silliman knew or should have known that further

21  investigation was necessary. In particular, Ms. Myers, who

22  represented Petitioner on remand for sentencing issues, declares that

23

24      [11] Under California law, the requirement that a defendant tried
    as an aider and abettor have knowledge of the principal's criminal
25  purpose and an intent to further that purpose is one of specific
    intent, regardless of whether the underlying crime with which the
26  direct perpetrator is charged requires specific intent. *People v.*
    *Mendoza*, 18 Cal. 4th 1114, 1131-32, 959 P.2d 735, 77 Cal. Rptr. 2d 428
27  (1998). Therefore, evidence of the defendant's voluntary intoxication
    and mental disorder is admissible for the purpose of negating the
28  mental element of aiding and abetting. *People v. Reyes*, 52 Cal. App.
    4th 975, 982, 61 Cal. Rptr. 2d 39 (1997).

1  a review of the files turned over to Mr. Silliman by Mr. Takasugi

2  suggested that Petitioner had a mental disability and that, in her

3  opinion, Mr. Silliman should have had conducted an investigation in

4  order to present a mental defense.[12]  [Traverse, Exh. A.]

5       Petitioner also presents an April 28, 2001 report from Dr. Carl

---

[12]  The declaration from Ms. Myers states the following:

1.   I am the attorney assigned to represent [Petitioner] on
     remand for sentencing issues.
2.   In reviewing the files and records in this case, it
     became apparent to me that the files and records
     disclosed that the mental issues were presented and
     should have been investigated by the trial attorney.
3.   [Petitioner] had one attorney, Alternative Public
     Defender [] Takasugi, for the preliminary hearing and
     another for pre-trial and trial, Mr. [] Silliman.  Mr.
     Silliman was deceased at the time this matter was
     returned for remand on specific sentencing issues.  Mr.
     Silliman's files were destroyed after his death.
4.   Pursuant to court order your declarant received copies
     of the files turned over to Mr. Silliman by Attorney
     Takasugi.  The files contained medical billings for
     services rendered to [Petitioner] near the time of his
     birth.  The files also indicated that Mr. Takasugi had
     attempted to subpoena additional records from the
     hospital and was investigating the possible mental
     defense at the time he declared his conflict and was
     relieved.
5.   A telephone call to the father of [Petitioner] resulted
     in further information regarding [Petitioner's] mental
     status.  [Petitioner's] father told me that
     [Petitioner] suffered oxygen deprivation and possible
     brain damage during or shortly after birth.
6.   Hospital records available indicate that he was born on
     10/16/1974 and hospitalized from 11/11/1974 through
     11/20/1974 at St. Francis Hospital in Pensacola,
     Florida.
7.   Further, school records indicate that [Petitioner] was
     in Special Education programs of the Los Angeles
     Unified School District, with learning disabilities.
8.   Your declarant petitioned the court for an expert, Dr.
     Osborn, to assist in evaluating these issues [with his
     report attached hereto].
9.   A review of the court trial record reveals that
     [Petitioner] was charged under a specific intent theory
     and the trier of fact was never informed of any mental
     defenses.

[Traverse, Exh. A.]

Osborn as proof of the mental evidence trial counsel allegedly would have uncovered, had he investigated, and which counsel should have introduced at trial. Dr. Osborn, a forensic psychologist examined Petitioner on three occasions, and reviewed Petitioner's school,[13] hospital, and trial records. [Traverse, Exh. B.] Dr. Osborne opined that Petitioner exhibited a range of cognitive problems that "almost certainly impaired" his ability to form "the specific intent necessary to the crimes of which he has been convicted." [Traverse, Exh. B.] According to Dr. Osborn's report, results of Petitioner's IQ tests revealed that Petitioner had "longstanding cognitive problems that are particularly troublesome in areas related to acquired knowledge, verbal reasoning and comprehension of verbal information." [Id.] Petitioner's abilities in these areas suggested mild mental retardation. [Id.] Dr. Osborn also made the following findings and observations: Petitioner suffers from longstanding and substantial cognitive, emotional, and expressive speech problems; Petitioner was "easily influenced by certain peers"; Petitioner was intoxicated "well before the criminal acts began" and became "increasingly intoxicated as the evening progressed";[14] and Petitioner's "intoxication by both alcohol and cocaine during [the] time period encompassed by these crimes further compromised his cognitive functioning." [Traverse, Exh. B.]

---

[13] The school records revealed that Petitioner repeated the first and third grades, was placed in Individualized Educational Planning, attended numerous special education programs, and was eventually classified as a Severely Emotionally Disabled child. [Traverse, Exh. B.]

[14] Petitioner told Dr. Osborn that he had drank two or three six-packs of beer before the instant offenses were committed. [Traverse, Exh. B.]

1    Petitioner argues that counsel's failure to investigate and
2 present evidence of Petitioner's mental health problems constituted
3 deficient performance, and that had the evidence been presented, there
4 is a reasonable probability that the outcome of his trial would have
5 been different. [Traverse at 16-18.]

6    **b.   Discussion**

7    Defense counsel has a "duty to make reasonable investigations or
8 to make a reasonable decision that makes particular investigations
9 unnecessary." Strickland, 466 U.S. at 691.  "This includes a duty to
10 investigate and introduce into evidence records that demonstrate
11 factual innocence, or raise sufficient doubt on that question to
12 undermine confidence in the verdict." Bragg v. Galaza, 242 F.3d 1082,
13 1088 (9th Cir.), as amended, 253 F.3d 1150 (2001).

14   For mental health defenses, counsel cannot ignore "abundant
15 signs" of mental illness or rest on a "preliminary examination."
16 Mickey v. Ayers, 606 F.3d 1233, 1236 (9th Cir. 2010).  At the same
17 time, such an investigation need not be endless. Id.  "[W]ith respect
18 to deficient investigations, the test for prejudice is whether the
19 noninvestigated evidence was powerful enough to establish a
20 probability that a reasonable attorney would decide to present it and
21 a probability that such presentation might undermine the jury
22 verdict." Id. at 1236-37 (citation omitted).

23   Here, based on Ms. Myers' declaration, the files that trial
24 counsel received from Mr. Takasugi apparently indicated further
25 investigation into Petitioner's mental status might be appropriate.
26 In light of trial counsel's death shortly after trial and the
27 destruction of his files, it is unclear whether or why counsel failed
28 to conduct further investigation on this issue; counsel did not

present a defense or any evidence of Petitioner's mental condition as a mitigating factor at Petitioner's initial sentencing.  However, the existing record does not necessarily establish that counsel's performance was objectively deficient in this context.

Although Dr. Osborne's letter, the primary source of Petitioner's present claim, opines that the nature and severity of Petitioner's problems "almost certainly impaired" Petitioner's ability to form the necessary intent for his crimes, defense counsel could have reached a reasonable professional judgment that any or further investigation into this issue was not necessary.  Although it appears, as Dr. Osborne describes in the letter, that Petitioner did have some cognitive developmental and educational problems, he last received mental health treatment at the age of fifteen, for a suicide attempt; Petitioner was not receiving treatment or taking any medication at the time of the offenses, the trial, or Dr. Osborne's interviews.  Cf. Seidel v. Merkle, 146 F.3d 750, 755 (9th Cir. 1998)(counsel's performance was objectively unreasonable for failure to investigate possibility of mental defense where there was "extensive history of mental problems," including psychiatric treatment while petitioner was awaiting trial, jail medical records indicating psychiatric hospitalization, and counsel's notes indicating petitioner was taking medication and had "fits and black outs" during commission of crime). The existing record does not indicate that Petitioner received or requested any special services or mental health treatment after he left high school, nor was there any apparent issue about Petitioner's competence to stand trial.  Under these circumstances, this record does not necessarily indicate "abundant signs" that Petitioner had a mental illness when the offenses were committed, and counsel may have

1   reasonably discounted the possibility that Petitioner's mental status

2   or intoxication made him so impaired that he lacked the necessary

3   capacity, under state law, to understand and to intend to further

4   Hearns's crimes, which did not involve great mental sophistication.

5   See generally Beeman, 35 Cal. 3d at 560 (aider and abettor liability

6   requires knowledge of criminal purpose of perpetrator and intent or

7   purpose either of committing, encouraging or facilitating commission

8   of offense).  Accordingly, based on the record and the "doubly

9   deferential" review of counsel's performance required on federal

10  habeas review, Petitioner cannot establish counsel's deficient

11  performance as to this claim.

12      More significantly, even assuming that counsel unreasonably

13  failed to investigate this issue and present the evidence, there is no

14  reasonable probability that counsel's deficient performance prejudiced

15  the outcome of the trial under the second prong of Strickland, as

16  evidenced by the state courts' evaluation of this evidence for

17  purposes of related claims.  Specifically, after Petitioner's case was

18  remanded for resentencing, Petitioner filed a motion for a retrial

19  alleging, inter alia, that his trial counsel was ineffective because

20  counsel failed to investigate and present a mental defense.  [Sup. CT

21  36-38.]  The trial court ruled that it did not have jurisdiction to

22  consider the motion because the appellate court remanded the matter

23  with a limited direction pertaining to sentencing.  [AAR CT 16; 3 AAR

24  RT 28.]  Thereafter, the trial court sentenced Petitioner to thirty-

25  nine years to life.  [3 AAR RT 32-36.]  In so doing, the court

26  selected midterm and low term sentences for the convicted offenses

27  (except count 3 which carried a mandatory sentence of twenty-five

28  years to life) after comparing the factors in aggravation - i.e.,

"high degree of callousness and high degree of risk of injury" - with the factors in mitigation - i.e., Petitioner was "a less active participant" and Dr. Osborn's report indicated that Petitioner had below average intelligence.  [3 AAR RT 32.]

Moreover, the California Court of Appeal considered Dr. Osborn's report in rejecting Petitioner's claim that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment (as discussed infra).  The appellate court found that Petitioner's allegation of diminished mental capacity failed to show that his sentence violated the Eight Amendment because Dr. Osborn's opinion was "couched as uncertain speculation" and "there [was] no indication that any intoxication impaired [Petitioner's] thinking or his abilities." [Return, G. at 200.]  The appellate court further found that Dr. Osborn's report indicating that Petitioner was "easily influenced by certain peers" was unexceptional because "it is in the nature of gang activity that gang members follow and influence others in the gang." [Return Exh. G at 200.]

The California courts' assessments of Dr. Osborn's report shed light on the probative value of such evidence had it or similar evidence been available and presented at trial.  Specifically, although evidence of Petitioner's diminished mental capacity constituted mitigating evidence for sentencing purposes, there was no "reasonable probability" that the outcome of the trial would have been different had counsel pursued or presented this evidence.  As noted above, the underlying crimes that Petitioner aided and abetted were not sophisticated criminal acts, and the level of mental capacity necessary to understand and to intend to further Hearns's criminal purpose was not high.  Indeed, the trial record strongly suggests that

Petitioner was sufficiently cognizant of the criminality of Hearns's actions toward Maria R., and that Petitioner intended to further Hearns's criminal purpose.  Although Petitioner appeared to be "in his own world," Petitioner complied with all of Hearns's orders without any apparent confusion or difficulty - _i.e._, Petitioner got into Maria R.'s car as Hearns held a knife against her throat; Petitioner held the knife behind Maria R.'s back when Hearns went to go purchase drugs; Petitioner exited the car and sat outside so that Hearns could rape Maria R. in private; and Petitioner sat in the car with Maria R. while Hearns went to broker the drug-for-sex transactions.  [1 RT 312-13, 324-26, 333-37.]

In addition, during their third trip to purchase drugs (_i.e._, the second time Maria R. was "sold" for drugs), Maria R. complained that she "felt like throwing up," and Petitioner responded by telling her to open the door and throw up.[15]  [1 RT 373-74.]  This was a rational, intelligible response evidencing Petitioner's understanding of his surroundings, particularly Maria R.'s physical condition.

Notably, Petitioner and Hearns were members of the same gang, and were previously convicted for making terrorist threats arising from the same incident.  [2 CT 513.]  In that incident, Petitioner and Hearns, along with several other Dogtown gang members, threatened to "shoot up" a family living in a housing complex if the family did not move out.  [2 CT 513.]  In light of the circumstances of the offenses and Petitioner's prior criminal activity, it is not reasonably likely that any factfinder would have found that evidence of Plaintiff's mental capacity negated his ability to form the requisite intent.

---

[15]   Maria R. testified that this was the only statement Petitioner made throughout the night.

1    Accordingly, Petitioner has failed to establish prejudice resulting

2    from counsel's possible failure to investigate Petitioner's mental

3    status.  <u>See</u> <u>Totten v. Merkle</u>, 137 F.3d 1172, 1175 (9th Cir. 1998)

4    (finding it was not "reasonably probable" under <u>Strickland</u> that, even

5    had the mental status information been presented, the jury would have

6    altered its verdict in light of evidence of petitioner's planning and

7    deliberate action).  Here, particularly in light of the "double

8    deference" afforded to state court adjudications of <u>Strickland</u> claims,

9    it is clear that federal habeas relief is not available on this claim.

10        **3.    Failure to Object to the Prosecutor's Elicitation of**

11             **Testimony That Petitioner Had Committed Rape**

12        Related to Petitioner's claim of prosecutorial misconduct,

13   Petitioner contends that his trial counsel rendered ineffective

14   assistance by failing to object to the prosecutor's elicitation of

15   testimony from Maria R. as to whether Petitioner had personally raped

16   her.  [Petition at 6.]  Petitioner argues that such testimony violated

17   the parties' stipulation that Petitioner did not have sexual contact

18   with Maria R. and constituted the admission of inadmissible hearsay

19   evidence.[16]  [Petition at 6.]  Petitioner also alleges that the

20   testimony "violated the tenet that a prior inconsistent statement

21   cannot be admitted for its truth if the witness truthfully testifies

22   that she does not remember an event."  [MPA Petition at 23.]

23        Here, however, Petitioner's trial counsel's lack of objection to

24   the prosecutor's questions despite the earlier stipulation could have

25

26        [16]   At issue is the above-noted colloquy between the prosecutor
     and Maria R.  In particular, Petitioner notes that Maria R.'s answer
27   to the prosecutor's question concerning Maria R.'s statement to police
     officers - that she believed Petitioner had raped her - constituted
28   inadmissible hearsay.  [1 RT 343.]

1  reasonably been part of counsel's general tactic to undermine Maria

2  R.'s credibility.  See Schell v. Witek, 218 F.3d 1017, 1026 n. 8 (9th

3  Cir. 2000)("[A] lawyer may properly make a tactical determination of

4  how to run a trial even in the face of his client's incomprehension or

5  even explicit disapproval." (quoting Brookhart v. Janis, 384 U.S. 1,

6  8, 86 S. Ct. 1245, 16 L. Ed. 2d 314 (1966))); see also Turner v.

7  Calderon, 281 F.3d 851, 876 (9th Cir. 2002)("[Counsel] cannot be

8  deemed ineffective because, with the benefit of hindsight, we now

9  determine that other trial strategies . . . may have been a better

10  choice.").  In particular, during closing arguments, trial counsel

11  emphasized that "if what [Maria R.] says took place caused her to . .

12  . go to the police and describe two acts of forced sexual intercourse

13  with [Petitioner] that could not and did not happen, th[e]n all of her

14  testimony becomes suspect."  [8 RT 1597-98.] Given that Maria R.

15  testified at trial that she could not recall whether Petitioner had

16  raped her, trial counsel pointed out Maria R.'s prior statement to the

17  police - that she had been raped by Petitioner - in order to show that

18  Maria R.'s recollection of the alleged crimes against her was

19  unreliable.  Moreover, the fact that counsel was aware of the parties'

20  stipulation prior to trial further suggests that his decision to allow

21  elicitation of such testimony was sound strategy under the

22  circumstances.  See Strickland, 466 U.S. at 690 (strategic choices

23  made after adequate investigation are "virtually unchallengeable").

24  As such, Petitioner has not overcome the strong presumption that trial

25  counsel's conduct fell within the wide range of reasonable

26  professional assistance.  See Bell, 535 U.S. at 702.

27      Nor can Petitioner show prejudice.  See Strickland, 466 U.S. at

28  694.  As discussed above, in light of the prosecutor's emphasis that

34

1   all the charges against Petitioner were based on an aider and abetter

2   theory and the fact that the judge was the trier of fact, Petitioner

3   cannot show that the trial court improperly relied on the elicited

4   testimony to convict him.  Accordingly, federal habeas relief is not

5   available on this claim.

6   **4.   Failure to Present a Closing Argument**

7   Petitioner asserts that trial counsel was ineffective because he

8   failed to present a closing argument which "would at the very least

9   have mitigated his culpability." [Petition at 6a.]   The Sixth

10  Amendment guarantees effectiveness of counsel during closing argument.

11  Bell, 535 U.S. at 701-702.  However, "[j]udicial review of a defense

12  attorney's summation is . . . highly deferential – and doubly

13  deferential when it is conducted through the lens of federal habeas."

14  Yarborough v. Gentry, 540 U.S. 1, 6, 124 S. Ct. 1, 157 L. Ed. 2d 1

15  (2003); see also Hovey v. Ayers, 458 F.3d 892, 906 (9th Cir. 2006).

16  Petitioner specifically argues that his trial counsel "completely

17  neglected to argue any facts relating to the degree of involvement

18  . . . that [P]etitioner may have had." [Traverse at 26-27.]

19  Petitioner alleges that trial counsel failed to review the evidence

20  and point out the weaknesses of the prosecution's case. [Traverse at

21  30.] Petitioner also argues that trial counsel failed to object to

22  the prosecutor's misstatement of the evidence during her closing

23  argument. [Traverse at 27.]

24  On direct appeal, the California Court of Appeal rejected this

25  claim, stating, in relevant part, as follows:

26      First, [Petitioner] faults trial counsel for not

27      arguing "that [Petitioner] was far less culpable than

28      Hearns" and for "mak[ing] no attempt to mitigate

35

1   [Petitioner's] actions in comparison of those of Hearns."
2   We cannot conceive of any prejudice flowing to [Petitioner]
3   as a result of his counsel's failure to mention such self-
4   evident matters to the court (which was sitting as trier of
5   fact) particularly since, as [Petitioner] himself
6   recognizes, the People had previously acknowledged that
7   [Petitioner's] culpability was far less than Hearns's. . . .
8   Lastly, [Petitioner] complains that his trial counsel
9   "failed to raise any issue as to whether [Petitioner] was
10  aiding and abetting Hearns." The court "scarcely needed a
11  detailed road map in the form of closing argument" (<u>People</u>
12  <u>v. Padilla</u> (1995) 11 Cal.4th 891, 949, overruled on an
13  unrelated point in <u>People v. Hill</u> (1998) 17 Cal.4th 800,
14  823, fn.1) to evaluate the aiding and abetting question, on
15  which there was overwhelming evidence against [Petitioner].
16  Consequently, any deficiency by trial counsel in this regard
17  was nonprejudicial.

18  [Return, Exh. B at 71-72.]

19      The state court's adjudication of this claim was neither contrary
20  to nor an unreasonable application of clearly-established federal law.
21  First, Petitioner fails to show either deficient performance or
22  prejudice from trial counsel's failure to argue about Petitioner's
23  minimal participation in the criminal acts committed by Hearns.   The
24  prosecutor acknowledged, in closing argument, that Petitioner's
25  liability with regard to his culpability in the charged offenses and
26  his punishment was "far less than [] Hearns['s].   [8 RT 1579.]
27  Moreover, it is reasonable to assume that the trial court, sitting as
28  trier of fact, was cognizant of the trial testimony that clearly

1  showed that Petitioner was less culpable than Hearns.

2      Petitioner's claim that trial counsel failed to review the
3  evidence and point out the weaknesses of the prosecution's case also
4  fails to establish deficient performance or prejudice.   Contrary to
5  Petitioner's contention, trial counsel, in his closing argument, did
6  point out the weaknesses of the prosecution's case.   As noted above,
7  trial counsel highlighted the discrepancy between Maria R.'s prior
8  statement to the police - that she had been raped by Petitioner - and
9  her trial testimony - that she did not recall whether Petitioner had
10 raped her - in order to show that Maria R.'s recollection of the
11 alleged crimes lacked credibility or was unreliable.   [8 RT 1597-98.]

12     Moreover, the arguments that Petitioner asserts trial counsel
13 should have presented would have been redundant.   Before Petitioner's
14 counsel's closing argument, Hearns's counsel presented a closing
15 argument that Maria R. was a willing participant in the sexual
16 encounters.   [8 RT 1581-89.]   In particular, Hearns's counsel
17 suggested that Maria R. had sexual intercourse with Hearns in order to
18 gain membership in his gang.   [8 RT 1588.]   He also noted that the
19 individuals, who had (or attempted to have) sexual intercourse with
20 Maria R. in exchange for drugs, told her their names (with one of them
21 giving her his phone number), which they probably would not have done
22 had they believed Maria R. was not a willing participant.   [8 RT 1586-
23 87.]   Hearns's counsel also noted that Maria R.'s refusal to perform
24 certain sexual positions that the individuals requested indicated that
25 she did not engage in these sexual acts out of fear.   [8 RT 1586-87.]
26 Hearns's counsel also pointed out the discrepancy between Maria R.'s
27 statement to the police that she had washed her clothes after the
28 sexual assaults and her testimony at trial that she had thrown the

clothes away.  [8 RT 1589.]  Hearns's counsel suggested that Maria
R.'s failure to recall whether she had washed the clothes (which could
have contained important evidence) or thrown them away undermined her
credibility.  [8 RT 1589.]  Hearns's counsel's closing argument
sufficiently presented the weaknesses of the prosecution's case.
Petitioner's trial counsel was not required to repeat these points.

     With respect to Petitioner's contention that his counsel should
have objected to the prosecutor's misstatement of the evidence,
Petitioner specifically complains about the following statement:
"[W]hen [Petitioner] is handed the knife, and places the knife behind
[Maria R.'s] neck and holds the knife behind her neck . . . , he is
acting, clearly, as an aider and abetter." [8 RT 1579.]  This was not
a misstatement of the evidence.  Although Maria R. initially testified
that Petitioner held the knife behind her <u>back</u>, she later clarified
where he held the knife by pointing to her "neck area." [1 RT 324-26,
2 RT 589.]  The "neck area" could reasonably refer to a person's
(upper) back or neck.  Moreover, without regard to whether Petitioner
held the knife behind Maria R.'s back or neck, trial counsel's failure
to object to the prosecutor's summary of evidence did not constitute
ineffective assistance because the error, if any, was minor and did
not materially distort the evidence against Petitioner.  <u>See</u> <u>United</u>
<u>States v. Necoechea</u>, 986 F.2d 1273, 1281 (9th Cir. 1993)("Because many
lawyers refrain from objecting during . . . closing argument, absent
egregious misstatements, the failure to object during closing argument
. . . is within the 'wide range' of permissible professional legal
conduct." (citation omitted)); <u>see also</u> <u>United States v. Molina</u>, 934
F.2d 1440, 1448 (9th Cir. 1991)(defense counsel's failure to object to
one improper passage in prosecutor's closing argument was not

1  "professionally unreasonable").  For the same reason, Petitioner

2  cannot demonstrate prejudice.  Again, this is especially true given

3  that Petitioner was tried in a jury-waived bench trial.  It is highly

4  unlikely that the trial judge construed comments by the prosecutor as

5  evidence.  For these reasons, federal habeas relief is not warranted

6  on this claim.  Yarborough, 540 U.S. at 6.

7       **C.**    **CRUEL AND UNUSUAL PUNISHMENT**

8       Petitioner contends that his sentence of thirty-nine years to

9  life constituted cruel and unusual punishment in violation of the

10  Eighth Amendment.  [Petition at 6.]

11       The Supreme Court has held that the relevant clearly established

12  law regarding application of the Eighth Amendment's proscription

13  against cruel and unusual punishment to sentences of imprisonment is a

14  "gross disproportionality" principle that can be invoked only in

15  "exceedingly rare" and "extreme" cases, and which otherwise "gives

16  legislatures broad discretion to fashion a sentence."  Lockyer v.

17  Andrade, 538 U.S. 63, 73-76, 123 S. Ct. 1166, 155 L. Ed. 2d 144

18  (2003); see also Graham v. Florida, _ _U.S. _ _, 130 S. Ct. 2011,

19  2021, 176 L. Ed. 2d 825 (2010)(noting that the Eighth Amendment "'does

20  not require strict proportionality between crime and sentence' but

21  rather 'forbids only extreme sentences that are grossly

22  disproportionate to the crime.'" (quoting Harmelin v. Michigan, 501

23  U.S. 957, 1001, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991)(Kennedy, J.,

24  concurring)(internal quotation marks omitted)); Ewing v. California,

25  538 U.S. 11, 23, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003)(same);

26  United States v. Meiners, 485 F.3d 1211, 1213 (9th Cir. 2007)("The

27  Supreme Court has repeatedly emphasized that 'federal courts should be

28  reluctant to review legislatively mandated terms of imprisonment, and

1    that successful challenges to the proportionality of particular

2    sentences should be exceedingly rare.'" (quoting Ewing, 538 U.S. at

3    22)); Taylor v. Lewis, 460 F.3d 1093, 1098 (9th Cir. 2006)

4    ("Accordingly, successful challenges based on proportionality are

5    'exceedingly rare,' and deference is due legislative judgments on such

6    matters." (quoting Solem v. Helm, 463 U.S. 277, 289-90, 103 S. Ct.

7    3001, 77 L. Ed. 2d 637 (1983)).[17]

8         Consistent with the limitation of the Eighth Amendment

9    proportionality principle to "rare" and "extreme" cases, the Supreme

10   Court generally has upheld prison sentences challenged as cruel and

11   unusual, and in particular has approved recidivist punishments similar

12   to Petitioner's twenty-five-years-to-life sentence, for offenses of

13

14        [17]  In Taylor, the Ninth Circuit described the appropriate
     analytical process for considering such challenges as follows:
15

16             In assessing the compliance of a non-capital sentence with
          the proportionality principle, we consider "objective factors" to
17        the extent possible. Foremost among such factors are the severity
          of the penalty imposed and the gravity of the offense.
18        Comparisons among offenses can be made in light of, among other
          things, the harm caused or threatened to the victim or society,
19        the culpability of the offender, and the absolute magnitude of
          the crime.
20
     Id., 460 F.3d at 1098 (quoting and citing Solem, 463 U.S. at 290, 292-
21   93).  Although Solem also suggested consideration of comparisons with
     other sentences, such intrajurisdictional and interjurisdictional
22   analyses are appropriate only in "the rare case in which [this]
     threshold comparison . . . leads to an inference of gross
23   disproportionality." Graham, 130 S. Ct. at 2022 (quoting Harmelin, 501
     U.S. at 1005 (Kennedy, J. concurring)); see also Norris v. Morgan, 622
24   F.3d 1276, 1287 and n. 12, 1288 (9th Cir. 2010)(holding that state
     court's failure to conduct the comparative analysis recommended by
25   Solem was not contrary to controlling Supreme Court authority because
     "the only relevant clearly established law for purposes of § 2254(d)
26   (1) in an Eighth Amendment challenge . . . [is] the gross
     disproportionality principle"); cf. Gonzalez v. Duncan, 551 F.3d 875,
27   887 (9th Cir. 2008)(conducting intrajurisdictional and
     interjurisdictional comparisons after finding petitioner's sentence of
28   twenty-eight years to life for failure to update annual sexual
     offender registration raised inference of gross disproportionality).

equivalent or lesser severity.  See Lockyer, 538 U.S. at 77 (denying habeas relief on Eighth Amendment disproportionality challenge to California third strike sentence of two consecutive terms of twenty-five years to life for stealing $150 in videotapes when petitioner had lengthy but nonviolent criminal history); Harmelin, 501 U.S. at 1008-09 (Kennedy, J., concurring)(holding that mandatory life sentence without parole for first offense of possession of more than 650 grams of cocaine is not so disproportionate as to violate the Eighth Amendment); Hutto v. Davis, 454 U.S. 370, 374-75, 102 S. Ct. 703, 70 L. Ed. 2d 556 (1982)(per curiam)(upholding non-recidivist sentence of two consecutive twenty-year prison terms for possession of nine ounces of marijuana and distribution of marijuana); Rummel v. Estelle, 445 U.S. 263, 285, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980)(holding that mandatory life sentence with the possibility of parole after ten to twelve years for offense of obtaining $120 by false pretenses does not constitute cruel and unusual punishment when offender had two prior theft convictions); cf. Graham, 130 S. Ct. at 2034 (holding that the Eighth Amendment categorically prohibits imposition of life sentence without possibility of parole for juveniles convicted of non-homicide offenses); Solem, 463 U.S. at 280-81 (holding unconstitutional a mandatory life sentence without possibility of parole for uttering a "no account" check for $100, as a seventh nonviolent felony).

Under state law, forcible rape carries a mandatory sentence of twenty-five years to life when the offense is committed under the specified circumstances of: (1) kidnaping the victim which causes a substantially increase in the risk of harm to the victim; or (2) kidnaping the victim (without a substantial increase in the risk of

harm) and personally using a deadly weapon.[18]  Cal. Penal Code

§ 667.61(a)-(e).  Considering Petitioner's additional convictions for

second degree robbery, three forcible rapes, and two attempted

forcible rapes, Petitioner's sentence of thirty-nine years to life was

well within the statutory guidelines.  See Cal. Penal Code §§ 207(a)-

208(d), 211, 261(a)(2), 664-261(a)(2), 667.6(d), 1170.1.  As such, it

was presumptively valid for Eighth Amendment purposes.  See Ely v.

Terhune, 125 F. Supp. 2d 403, 410 (C.D. Cal. 2000)("A punishment

within the legislatively mandated guidelines is presumptively valid."

(citing Rummel, 445 U.S. at 275-76; United States v. Mejia-Mesa, 153

F.3d 925, 930 (9th Cir. 1998))); see also United States v. Parker, 241

F.3d 1114, 1117 (9th Cir. 2001)("Generally, as long as the sentence

imposed on a defendant does not exceed statutory limits, this court

will not overturn it on Eighth Amendment grounds.").  Indeed, the

court selected midterm or low term sentences for the convicted

offenses (except count 3 which carried the mandatory sentence of

twenty-five years to life) because, even though the offenses involved

a high degree of callousness and risk of injury, mitigating evidence

showed that Petitioner had below average intelligence and was "a less

active participant" in the crimes. [3 AAR RT 32.]

Nevertheless, Petitioner still argues that the sentence was

unduly harsh given his minimal participation in the criminal acts.

[MPA Petition at 25.]  He reasons that he simply sat in the back seat

of the car in his "own little world."  [MPA Petition at 25.]  He

claims that when he was given the knife, he "merely held it while he

---

[18]  Although either of the two specified circumstances triggered
the mandatory sentence, the trial court found both of the specified
circumstances to be true.  [2 CT 451, 530-31; 8 RT 1610, 1618-19.]

42

sat in the back seat" and "never displayed it to the victim nor made

any threats or demands." [MPA Petition at 25.] He also notes that he

has "longstanding cognitive problems and was drunk and using cocaine

at the time the victim was raped by Hearns." [MPA Petition at 25.]

These arguments do not direct a different result for purposes of

Eighth Amendment analysis. As the California Court of Appeal

articulated in denying Petitioner's claim:

> [Petitioner] acknowledges . . . that there was "some
> testimony" that during the approximately six-hour incident
> [Petitioner] raped the victim. Indeed, some of the evidence
> at trial reveals far more active criminal participation by
> [Petitioner] than he chooses to detail. As indicated by
> testimony from an emergency room nurse who hours after the
> incident performed a rape examination of the victim, the
> victim told the nurse that after Hearns raped her in the
> car, he called to [Petitioner]. [Petitioner] then lowered
> his pants, got on top of the victim in the front passenger's
> seat and had sex with her without a condom. As [Petitioner]
> acknowledges, the victim also initially told the police that
> [Petitioner] indeed did rape her, but later, because of the
> nightmares she had about the incident, and perhaps because
> of the drugs her abductors had forced her to take, the
> victim became confused and was uncertain about whether
> [Petitioner] had raped her.
>
> It is apparent, however, that substantial evidence
> supports the conclusion that [Petitioner's] role in these
> sex offenses was more than that of a person who merely held
> a knife for a few minutes. Rather, he was an active

43

participant in the rape of the victim.  To the extent, as
indicated by Dr. Osborn's letter, certain peers easily
influenced [Petitioner], we find such a phenomenon
unexceptional.  In fact, it is in the nature of gang
activity that gang members follow and influence others in
the gang.

Equally unavailing is [Petitioner's] reliance on Dr.
Osborn's opinion that [Petitioner] had a range of cognitive
problems that "may" have impaired his ability to form the
requisite specific intent for the crimes.  [Petitioner] does
not suggest that people with cognitive problems are
necessarily unable to obey the law, and Dr. Osborn's opinion
is couched as uncertain speculation.  Nor is Dr. Osborn's
mention of [Petitioner's] voluntary ingestion of alcohol or
cocaine a particularly sympathetic factor, as there is no
indication that any intoxication impaired [Petitioner's]
thinking or his abilities.

[Return, Exh. G at 199-200.][19]

Moreover, Petitioner understates his role in instilling fear
on Maria R. during the course of the crimes.  During the early
stages of the six or seven hour ordeal, Petitioner held a knife
behind Maria R.'s back to prevent her from escaping.  [1 RT 324-
26.]  She was scared to run away from Petitioner even though she
was alone with him because she "didn't know what his reaction was

---

[19]  As the court of appeal noted, the parties' stipulation – that
Petitioner did not have sexual contact with Maria R. – precluded
consideration of evidence that Petitioner had raped Maria R. to
establish guilt.  However, the stipulation did not preclude
consideration of such evidence in determining the propriety of
Petitioner's sentence.  [1 CT 112-13, Return, Exh. G at 199-200 f.1.]

1   going to be." [1 RT 326.] Although Petitioner did not display
2   the knife to Maria R. or make threats against her at any point
3   during the night, he never indicated that he would not hurt her.
4   [2 RT 549.] Thus, Petitioner's presence caused fear in Maria R.
5   throughout the entire night. [2 RT 548-49.]
6       Furthermore, Petitioner has a lengthy and significant
7   criminal history. See Ewing, 538 U.S. at 29 (recognizing that
8   State's legitimate concern in imposing third strike sentence
9   includes interest "in dealing in a harsher manner with those who
10  by repeated criminal acts have shown that they are simply
11  incapable of conforming to the norms of society as established by
12  its criminal law" (quoting Rummel, 445 U.S. at 276)); Ramirez,
13  365 F.3d at 768 ("'[I]n weighing the gravity' of [petitioner's]
14  offense in our proportionality analysis, 'we must place on the
15  scales not only his current felony,' but also his criminal
16  history." (quoting Ewing, 538 U.S. at 29)). As detailed by the
17  state appellate court:
18          In terms of analyzing the nature of the offender,
19      [Petitioner] admits his membership in the "Dogtown" gang and
20      acknowledges some of his recidivism. But [Petitioner's]
21      past criminal activity was not, as he suggests, one which
22      entails "a relatively insignificant record." The probation
23      report indicates that at the time of the crimes [Petitioner]
24      was approximately 21 years old, had an outstanding arrest
25      warrant for a probation violation when arrested in the
26      present case, and had at least one known alias.
27      [Petitioner] admitted to the probation officer that he was
28      arrested as a juvenile for theft of spray paint, and he was

                                45

1    arrested in 1994 for burglary and public fighting and in

2    1995 for possession of a dangerous weapon and robbery.  Also

3    in 1995, [Petitioner] pled guilty to making terrorist

4    threats, stemming from an incident in which [Petitioner],

5    Hearns, and other gang members threatened to "shoot up" a

6    family living in the housing projects if they did not move

7    out that night.  For that offense, [Petitioner] received a

8    suspended sentence and was granted probation for three

9    years.  He was also ordered not to associate with Dogtown

10   gang members and not to use force or violence against others

11   – lawful and reasonable directives with which he obviously

12   failed to comply.  His probation was later revoked, and a

13   bench warrant was issued for his arrest.

14        Several months before the present offenses, in March of

15   1996 [Petitioner] was arrested [f]or carrying a concealed

16   weapon and in May of 1996 arrested for grand theft of

17   vehicle.  [Petitioner] acknowledged to the probation officer

18   that at the time of his arrest in August of 1997 he had been

19   "on the run" for approximately three months.  [Petitioner]

20   also acknowledged that he quit high school in the 11th grade

21   because he had a confrontation with a security guard at the

22   high school, and that he had been unemployed for over two

23   years at time of his arrest.

24   [Return, Exh. G at 200-01.]

25        In light of the foregoing, it cannot be said that

26   Petitioner's sentence was "exceedingly rare," "extreme," or

27   "extraordinary," so as to raise an inference of gross

28   disproportionality under the standard imposed by controlling

1  Supreme Court law.   Accordingly, the state court's rejection of
2  Petitioner's Eighth Amendment claim is entitled to AEDPA
3  deference, and federal habeas relief should be denied.

4                    **VI.    RECOMMENDATION**

5        For the reasons discussed above, it is recommended that the
6  court issue an order: (1) approving and accepting this Report and
7  Recommendation; and (2) denying the petition and dismissing this
8  action with prejudice.

9

10  DATED:   July 15, 2011

11

12

                              _____
13                            CARLA M. WOEHRLE
                              United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              47